Reversed and Rendered and Opinion filed January 30, 2007








Reversed
and Rendered and Opinion filed January 30, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00004-CV

____________

 

LANNA L. LEE, F/K/A LANNA PAI, AND
B. LANNA, INC.,
Appellants

 

V.

 

THEODORE HASSON, H. INTERNATIONAL
DISTRIBUTION, INC. A/K/A HASSON INTERNATIONAL DISTRIBUTION, INC., AND
DIVERSIFIED FINANCIAL ENTERPRISES, Appellees

 



 

On Appeal from the 129th
District Court

Harris County, Texas

Trial Court Cause No. 00-34427

 



 

O P I N I O N








This appeal arises from a dispute over the existence and
enforceability of an oral contract between an insurance broker/financial
advisor and his wealthy friend and client, who retained his services as an
advisor regarding the division of property incident to her divorce.  The
outcome of the appeal turns on the existence and fulfillment of any informal
fiduciary duty owed by the advisor to the client.  The client, appellant Lanna
Lee (formerly Lanna Pai) and her company, appellant B. Lanna, Inc., challenge the
judgment entered in favor of the advisor, appellee Theodore Hasson (AHasson@) and his
companies, appellees H. International Distribution, Inc. a/k/a Hasson
International Distribution, Inc. and Diversified Financial Enterprises. 
Appellants argue, inter alia, that the trial court erred by granting
appellees= motion to disregard the jury finding that a
relationship of trust and confidence existed between Lee and Hasson and contend
that this ruling constitutes harmful error because there is no evidence that
Hasson complied with the fiduciary duty arising from that relationship. 
Therefore, appellants argue, Hasson failed to overcome the presumption that the
agreement, if any, is void.  We agree, and accordingly, we reverse and render
judgment that appellees take nothing. 

I.  Factual and
Procedural History

A.      The Hasson and Pai History Before the Oral
Agreement[1] 

Lou Pai married Lanna Lee in 1976.  They had a son, B.P.,
in September, 1979, and a daughter, S.P., born in 1982.  Pai has advanced
degrees in economics and at the time of these events, he was an executive in
various Enron companies; Lee was a college-educated homemaker. Through their
children, the Pais met Theodore and Terry Hasson in 1993.  Ted Hasson was a
life insurance agent and securities dealer.  The Hassons and the Pais became
good friends and spent many vacations and holidays together.  In 1995, Hasson sold
the Pais a $5 million second-to-die life insurance policy and learned their
personal medical information and some of their financial information.  The Pais
applied for a $6 million policy in June 1995, a $15 million policy in November
1996, and a $50 million policy in March 1998.








In January 1998, Lee discovered that Pai had been having an
extra-marital affair and had another child outside of their marriage.  She
confided her discoveries to the Hassons.  Pai moved out of the family home in
1999, and Lee interviewed various family law attorneys, including Lawrence
Rothenberg.  Lee=s sister, who is also an attorney,
accompanied Lee to some of these interviews.  On June 15, 1999, attorney J.D.
Bucky Allshouse filed a petition for divorce on Lee=s behalf; however,
Lee withdrew the suit ten days later. 

On or about August 26, 1999, Lee sought Hasson=s advice. 
Anticipating a divorce, Lee asked Hasson what actions she should take while she
was still married.  At Hasson=s request, Lee forwarded financial
statements from Pai=s bank to Hasson.  According to Hasson, he
was Ashocked@ by the financial
statements.  Hasson discovered that the Pais= net worth was
approximately two and half times the amount Hasson had believed it to be and
that a large portion of their assets consisted of Enron stock and options. 
Hasson spoke with Lee about diversification, and at Hasson=s suggestion, Lee
began the application process for a variable life insurance policy in the
amount of $12 million.  Within a few months, the amount of this policy was
doubled to $25 million.  Hasson also advised Lee to pressure Pai to exercise
Enron stock options or sell stock, and Lee asked Pai to do so.

B.      The Original Agreement

The parties do not dispute that Pai wanted to negotiate his
divorce from Lee without attorney involvement.  It is also undisputed that Lee
turned to Hasson for advice in negotiating the divorce.  As Lee testified:

Lou never wanted lawyers involved and, you know, when Ted and I would
talk, Ted would also say, Lanna, you don=t really need aClawyers to work outCto get a favorable settlement.  So, you know, it wasn=t only Lou.

. . .








Lou did say that, too, but you
know, asCthe reason we=re here, you know,
Ted was a friend and Ted and I were talking a lot. We had lots of discussions
and he was saying, you know, Ted was helping me and, you know, Ted was also
saying, you know, Lanna, we don=tCyou know, I can
help you brainstorm about possible marital settlement ideas and you really don=t, you know, you
don=t really need a
lawyer to work out a favorable settlement.

Hasson contends that in September 1999, Lee offered to hire
him to work for her full-time.  According to Hasson,

Basically the agreement I had with her at that time
was to agree to agree, so to speak.  In other words, thisCthis was like new territory, so we
both needed to kind of get a grip with what was going to need to be done, the
things she was going to be asking me to do, the amount of time that she was
going to be asking me toCto take.  SoCit seemed to me and to Lanna that what made the most sense
was to just kind of start feeling our way through this, and that=s what we did startingCstarting really in October [1999]. 
So October, November, December, we got a pretty good flavor for what this thing
was going to take. 

The nature of Hasson=s services is
imprecisely defined in the record, and the jury charge did not require the jury
to identify the services that Hasson was required to render, or over what
period of time.  According to Hasson=s live pleadings
at the time of trial, 

[Hasson agreed] to essentially do
whatever [Lee] asked Hasson to do and to wear whatever Ahat@ [Lee] asked
Hasson to wear in achieving the ultimate goal which was the best property
division and settlement possible as quickly as possible with the minimum
adverse impact on [Lee] and her children. [Lee] and Hasson agreed that Hasson
would assist [Lee] in developing options and alternatives, considering the
impact of any decision or course of action on [Lee]=s quality of life
and [Lee]=s children, keeping focused on the various issues and
decisions which would have to be made on a short, medium and long-term basis,
considering the consequences of pursuing an option, alternative or decision,
the impact on Lou Pai and his potential reaction, as well as considering [Lee]=s exposure to
market risk related to the Enron stock and stock options which were a major
asset in the community estate.  

Hasson
described his negotiations with Lee as follows:

Q:      What did you understand she was talking
about hiring you to do?








A:      At that
time [September 1999]?  Well, I think the only thing we talked about was, hey,
listen, I=ve fought this situation.  Oh, yes, I remember this. 
She said, listen, I=m getting ready to negotiate with the
toughest negotiator at the Enron Corporation.  It=s going to be the
biggest deal of my life, and I=m going to need some help with that.  I
remember that.

Hasson=s lawyer also
asked him why Lee hired Hasson rather than a licensed family law attorney. 
Hasson testified:

Q:      All right.  Well, here=s what I=m a little curious about.  And I=m sure the jury is curious about
this.  Why didn=t she just go out and hire the best
divorce lawyer in Texas?

A:      You know what?  On that dayCat that point in time on that day I
actuallyCI didn=tCI didn=t know about that, and I don=t think that was anythingCI know thatCthat wasn=t something that was discussed on
that day.

Q:      Was there a time when she did explain to you
why she wasn=t out hiring a first-class divorce
lawyer?

A:      Absolutely. 
SheCshe just said,
hey, listen, Lou wants to do this thing without lawyers, and I=mCme, too.  I don=t really want to
do it without lawyers, and soCI mean, it couldn=t have beenCit was just real
simple.

C.     Hasson=s Work for Lee

Hasson contends he began working for Lee in October 1999
and reached an oral agreement with her regarding his compensation on January
18, 2000.  According to Hasson, he presented three different compensation
schemes to Lee, and she selected the option in which she agreed to place her
entire share of the marital estate into a limited partnership with Hasson, give
him 10% of the partnership, and pay him an annual salary equal to 1% of the
share of the marital estate she received in the divorce.  Hasson further
testified that Lee agreed to build a multimillion dollar home (the ADunsinane House@) for the Hassons
and lease it to the Hassons for an annual rent equal to 10% of the home=s value, deducting
the rent from Hasson=s salary.     








During his first month of employment, Hasson helped Lee
obtain a mortgage loan and line of credit; however, as Hasson conceded at
trial, Pai already had arranged such financing before Hasson=s involvement.  At
trial, Hasson testified that he did not know whether the terms of the loan he
arranged were better or worse than the terms of the loan arranged by Pai;
however, the loan arranged by Hasson included a payment of $120,000 to Hasson=s company,
Diversified Financial Enterprises.  Lee also gave Hasson a check for $100,000
for earnest money for a house she considered buying.[2] 
According to Lee, AIt was Ted=s idea.  He told
me I should buy a house.@  However, the contract for the property
identifies Theodore and Theresa Hasson as the buyers.  Lee testified she later
learned that Hasson put the earnest money check in his bank account and told
her the contract fell through.  According to Hasson, however, both this check
and the $120,000 payment to Diversified Financial Enterprises were advances
against the amounts he would be due under his oral agreement with Lee.

At some point, Lee also expressed concern to Hasson that
she might be sued for the actions of her son.[3] 
Lee=s son was over
eighteen years old at this time, and Hasson Adid have that idea@ that B.P=s judgment
creditors, if any, could not recover against Lee.  However, partly in response
to these concerns, and partly for unspecified tax reasons, Hasson arranged for
the formation of a corporation, B. Lanna, Inc., on February 11, 2000.  The company
was intended to be part of an asset protection mechanism.  There is some
evidence that Hasson owned 10% of the company.  Hasson=s accountant,
Raleigh Bailes, served as the company=s chief financial
officer. 








As anticipated, Lou Pai filed for divorce on March 3, 2000
in the 245th District Court of Harris County, Judge Annette Galik presiding. 
Pai and Lee mediated their divorce in April and May 2000.  According to Hasson=s wife, Lee Awasn=t always happy
with that decision [to negotiate the divorce without attorneys].  She wanted to
go to court and kind ofCyou know, I guess she felt that that would
be a way to kind of bring things out in the open.  And so Ted would kind of
tell her that probably it wasn=t in her best interest if Lou was going to
do what was right.@  Nevertheless, at Lee=s invitation,
Hasson accompanied her to interview divorce attorney Donn Fullenweider.  Hasson
suggested that attorney Lawrence Rothenberg review Fullenweider=s proposed
contract.  According to Hasson, he advised Lee not to retain Fullenweider based
on Rothenberg=s advice.  

Lee discussed the offers and counteroffers of the divorce
mediation with Hasson, including specific figures and percentages of the
proposed marital property division.  Hasson also advised Lee regarding
negotiating tactics and strategies.  Although Hasson did not attend any of the
mediation sessions, Victor Harris, Lee=s accountant,
accompanied her.  Hasson and Lee did not disclose the existence of their oral
agreement to Harris.  According to Hasson, he was honoring Lee=s request that no
one know about her contract with him.

D.      The Modification and Termination of the Agreement








Hasson claims that on May 3, 2000, Lee told him that she
wanted to modify her oral agreement with him to eliminate the contemplated
partnership and instead pay Hasson 10% of the value of her marital estate at
the time of her divorce in exchange for services he had rendered in the past
and was expected to render in the future.  According to Hasson, he also agreed
to work for the remainder of the year to finish pending projects for which he
would be paid a salary equal to 1% of Lee=s share of the
marital estate.  Hasson further testified that the Dunsinane House was no
longer part of his compensation package after May 3, 2000.  Nevertheless, he
continued to work with various contractors on the house and continued using Lee=s money to do so. 
On May 4, 2000, Hasson signed a contract for the addition of a pool to the
Dunsinane House at a cost of approximately $86,000.  He signed the contract AP.O.A. for L. Pai.@[4]  No evidence was
presented at trial that Hasson had a valid power of attorney at that time.

At some point, Lee and Pai verbally agreed to begin
separating their assets and treating the assets under each spouse=s control as his
or her own.  Pai exercised options and sold large quantities of Enron stock
during the first five months of 2000.  Although Lee still maintained a joint
account with Pai, she opened additional accounts to which Hasson was added as a
signatory.  Pai transferred funds allocated to Lee to one or more of Lee=s accounts.

On May 19, 2000, Hasson, Lee, and accountant Raleight
Bailes held a meeting to prepare for the final divorce mediation scheduled to
take place a few days later.  Bailes described the meeting as follows:

We discussed whether or not [Lee]
should withdraw the money from the joint account [with Pai] and put it into her
account.  I suggested that she call her attorney Donn Fullenwilder [sic], to
get his input.  Ted said that wasn=t a good idea
because Donn was going to charge her $7,000,000 to get her 50% of the community
estate.[5] 
Recognizing that [Lee] was going to get this money sooner or later, it was
agreed that she would not invade the [joint account] unless the settlement
negotiations broke down.

The
conversation then addressed the necessity or desirability of immediately withdrawing
funds from Lee=s accounts for particular purposes.  The versions of
this conversation given by Bailes, Lee, and Hasson differ.  According to
Bailes, he informed Lee and Hasson that: 








to the extent that [Lee] was paying
valid business, investment or personal expenses, she might have a shot at
having that come out of the community assets. [Lee] then detailed the expenses
that were going to be paid and mentioned she owed [Hasson] some money for his
services.  I jokingly asked how much, $10,000?  After laughing, [Lee] outlined
to me her deal with [Hasson]: [Hasson] will get a fee equal to 10% of the fair
market value of what she recovers in the divorce settlement with [Pai].  Since
she has already recovered $40,000,000, she owes him $4,000,000 currently, and
will owe him 10% of whatever assets she receives in the future as a result of
the divorce.  To maximize the potential tax deduction to [Lee], I suggested all
these expenses be paid by B. Lanna, Inc. and . . . . I recommended [Hasson=s] fee be paid to
his corporation.

According
to Lee, Hasson told her that Judge Galik was likely to freeze the assets in the
marital estate, and Hasson and Lee discussed the need to withdraw funds from
Lee=s accounts before
that occurred in order to pay for current expenses.  Lee testified that she
subsequently transferred $4 million to Hasson=s company with the
intent that he hold the money for her.  In his testimony, Bailes agreed that
Lee and Hasson discussed whether Lee should withdraw funds and have Hasson hold
the funds for her, but according to Bailes, he advised Lee not to do so, but to
pay Hasson only if she owed him money.  Hasson also testified that he and Lee
discussed whether Judge Galik would freeze the assets in the marital estate,
but according to Hasson, Lee introduced the subject. 

In any event, on May 23, 2000, Hasson transferred $5.95 million
from Lee=s account to B.
Lanna, Inc.  The corporation then issued a cashier=s check for $4
million to H. International Distribution, Inc., the company through which
Hasson and his wife sell Amway products.

Bailes testified that a few days later, Lee contacted him
in an effort to reach Hasson, and Bailes told Lee that Hasson was on vacation. 
Lee and her daughter then joined the Hassons on vacation in early June. 
According to Lee, she asked Hasson to return the $4 million.  Lee returned from
the vacation a week or so before Hasson.  








When Hasson returned, Lee arranged to meet with him on June
29, 2000.  According to Hasson, Lee told him at the meeting that she would not
pay him 10% of her share of the marital estate and asked him to accompany her
to the office of attorney Warren Cole.  Hasson refused to do so, and Lee left. 
Later that day, Cole sent Hasson a letter by messenger informing Hasson that
all business relationships between Lee and Hasson were terminated and all
powers of attorney revoked.  Cole=s letter further
advised Hasson that Aany possessory interest you may have
thought you would have had in the [Dunsinane House] is hereby revoked and
terminated.@  Cole also requested that Hasson return the $4
million previously transferred and resign from B. Lanna, Inc. by July 14, 2000.

E.      The Divorce

Pai and Lee were divorced on August 21, 2000.  Under the
terms of the Agreement Incident to Divorce (AAID@), Pai and Lee
agreed that the marital estate, exclusive of certain securities discussed
below, was worth $193,620,145.  Lee received over 57% of the assets of the
marital estate, and her share of the estate had a total agreed value of
$110,536,269, excluding restricted or unissued securities.  

Pai and Lee also agreed that Lee would receive one-half of
the equity Pai was entitled to receive in The New Power Company.  Specifically,
under his employment agreement with an Enron affiliate, Pai was entitled to
receive 2% of the equity in The New Power Company for an amount that totaled
2,064,400 shares; however, the stock had not yet been issued at the time of the
divorce.  Pai received the shares in October 2000 subject to transfer
restrictions, and the value of Lee=s portion of the
stock under the AID was disputed at trial.  The AID did not place a value on
the unissued securities, but merely allotted half of the equity to Lee and half
to Pai.  In assigning values to the other assets of the marital estate, Lee and
Pai agreed that each cash account had a value equal to its balance on May 24,
2000, and publicly traded securities were assigned their value as of July 24,
2000.  The AID did not identify a method for determining the value of stock
that had not yet been issued. 

F.       Hasson=s Suit








Hasson sued Lee on July 10, 2000, alleging that Lee=s share of the
marital estate, including the New Power shares, totaled approximately $140
million, and that Lee owed him 10% of this amount in payment for his services
under the terms of the May 3, 2000 modification of their oral agreement.[6] 
At trial, Lee denied that she had an agreement with Hasson, and contended that
he was instead a helpful friend.  In the alternative, she argued that the
agreement described by Hasson is unenforceable.  Lee also countersued for
recovery of funds Hasson and his companies received from Lee, alleging that
Hasson converted Lee=s funds, committed fraud, or breached his
duty as a bailee.

The jury found that Lee agreed to pay Hasson a fixed
percentage of the value of her share of the marital estate at the time of her
divorce in exchange for Hasson=s agreement to provide services.  The jury
also found that Lee had failed to comply with the agreement, and that her
failure was not excused on the grounds that (a) Hasson=s services
constituted the unauthorized practice of law, (b) the agreement was
unconscionable, or (c) Hasson was equitably estopped from enforcing the
agreement.  The jury further found that Lee owed Hasson $10 million, and
that the reasonable fees for the necessary services of Hasson=s attorneys
totaled $4 million.  In response to Question 16 of the charge, the jury
found that a relationship of trust and confidence existed between Lee and
Hasson at the time they entered into the oral agreement.  The jury also
answered Question 17 affirmatively, finding that Hasson had complied with his
fiduciary duty to Lee.  The jury failed to find that Hasson or his companies
had converted funds belonging to Lee or that Hasson had committed fraud.








Hasson, Lee, and their respective companies filed
cross-motions asking the trial court to disregard particular jury findings. 
Lee and B. Lanna, Inc. asked the trial court, among other things, to disregard
the jury=s finding that
Hasson complied with his fiduciary duty to Lee, as found in response to
Question 17 of the jury charge.  Conversely, Hasson and his companies asked the
trial court to disregard the finding that Hasson and Lee shared a confidential
relationship, as determined by the jury=s answer to
Question 16.  The trial court entered a final judgment disregarding the jury=s answer to
Question 16 as requested by appellees.  

II.  Issues
Presented

Lee presents six issues for appellate review, and Hasson
presents a single cross-point.  In her first issue, Lee argues that, because
the evidence that Hasson complied with his fiduciary duty to Lee is legally
insufficient, the trial court committed harmful error in disregarding the jury=s finding that
Hasson had a relationship of trust and confidence with Lee.  In her second and
third issues, Lee argues that the contract between Hasson and Lee is
unenforceable because it is unconscionable and violates public policy.  In her
fourth issue, Lee challenges the factual sufficiency of the evidence supporting
the jury=s finding that
Hasson sustained actual damages in the amount of $10 million.  Lee argues in
her fifth issue that the jury=s finding that Lee and Hasson agreed that
Lee would pay Hasson a fixed percentage of the value of her share of the Pai
marital estate in exchange for Hasson=s services is
corrupted by a Atilting@ or Anudging@ instruction that
an agreement Aneed not be in writing@ to be Aenforceable.@  Lastly, Lee asks
the court to modify the judgment to delete any recovery by Hasson=s companies
against Lee=s corporation.[7] 


In a cross-point, Hasson challenges the factual sufficiency
of the evidence supporting the jury=s finding that Lee
had a relationship of trust and confidence with Hasson.[8]









III.  Analysis

A.      Relationship of Trust and Confidence

In Lee=s first issue, she contends that the trial
court committed harmful error in disregarding the jury=s finding that
Hasson had a relationship of trust and confidence with her.  Hasson=s cross-point, in
which he argues that the evidence is factually insufficient to support the jury=s finding that Lee
and Hasson had a relationship of trust and confidence, relates to the same jury
question.  This issue is important to both parties because the existence of
such a relationship not only imposes on Hasson the elevated duty of a
fiduciary, but also places the burden on him to prove that he complied with
that duty.  See Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex.
565, 160 S.W.2d 509, 514 (Tex. 1942) (holding that one who occupies a fiduciary
relationship to another must measure his conduct by high equitable standards
and not by the standards required in arm=s-length
transactions); Chien v. Chen, 759 S.W.2d 484, 495 (Tex. App.CAustin 1988, no
writ) (holding that transactions between a fiduciary and his principal are
presumptively void). 

1.       Standard of Review

A trial court may disregard a jury=s verdict and
render a judgment notwithstanding the verdict if no evidence supports one or
more of the jury=s findings or if a directed verdict would
have been proper.  Tiller v. McClure, 121 S.W.3d 709, 713 (Tex. 2003). 
To determine whether the trial court erred in rendering a judgment
notwithstanding the verdict, we review the entire record, crediting favorable
evidence if reasonable jurors could and disregarding contrary evidence unless
reasonable jurors could not.  See City of Keller v. Wilson, 168 S.W.3d
802, 827 (Tex. 2005).  In the course of our review, we assume that jurors
decided questions of credibility or conflicting evidence in favor of the
verdict if they reasonably could do so.  Id. at 819, 820. 








AThe final test for legal sufficiency must
always be whether the evidence at trial would enable reasonable and fair-minded
people to reach the verdict under review.@  Id. at
827.  If the evidence Awould enable reasonable and fair-minded
people to differ in their conclusions, then jurors must be allowed to do so.@  Id. at
822.  We do not substitute our judgment for that of the trier-of-fact if the
evidence falls within this zone of reasonable disagreement.  Id.  

Hasson=s challenge to the factual sufficiency of
the evidence is subject to a different standard of review.  When reviewing a
jury finding for factual sufficiency, we consider and weigh all of the evidence
and conclude that the finding is not supported by factually sufficient evidence
only if the finding is so contrary to the overwhelming weight of the evidence
as to be clearly wrong and unjust.  See Cain v. Bain, 709 S.W.2d 175,
176 (Tex. 1986) (per curiam). 

2.         Governing Law








The term
Afiduciary@ refers to a person owing a duty of
integrity and fidelity, and Ait applies to any person who occupies a position of peculiar
confidence towards another.@  Kinzbach Tool Co., 138 Tex. at 571, 160 S.W.2d at
512.  In certain formal relationships, such as an attorney-client or trustee
relationship, a fiduciary duty arises as a matter of law.  Johnson v. Brewer
& Pritchard, P.C., 73 S.W.3d 193, 199 (Tex. 2002).  Texas courts also
have recognized that certain informal relationships may give rise to a
fiduciary duty.  See Crim Truck & Tractor Co. v. Navistar Int=l Transp. Corp., 823 S.W.2d 591, 594 (Tex. 1992). An
informal fiduciary relationship exists Awhere, because of family relationship
or otherwise, [one party] is in fact accustomed to be guided by the judgment or
advice@ of the other.  Thigpen v. Locke,
363 S.W.2d 247, 253 (Tex. 1962).  ASuch informal fiduciary relationships
have also been termed >confidential relationships= and may arise >where one person trusts in and relies
upon another, whether the relation is a moral, social, domestic or merely
personal one.=@  Crim Truck & Tractor Co., 823 S.W.2d at 594
(quoting Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256, 261 (1951)). 
Stated another way, a party fails to comply with his fiduciary duty Awhere influence has been acquired and
abused, and confidence has been reposed and betrayed.@   Hoggett v. Brown, 971
S.W.2d 472, 488 (Tex. App.CHouston [14th Dist.] 1997, pet. denied) (citing Crim Truck
& Tractor Co., 823 S.W.2d at 594).

AIn order to give full force to contracts, we do not create
such a relationship lightly.@  Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171,
177 (Tex. 1997).  As we have previously stated,

A person is justified in placing confidence in the
belief that another party will act in his or her best interest only where he or
she is accustomed to being guided by the judgment or advice of the other party,
and there exists a long association in a business relationship, as well as
personal friendship. 

Hoggett, 971 S.W.2d at 488.  AThe existence of the fiduciary
relationship is to be determined from the actualities of the relationship
between the persons involved.@  Thigpen, 363 S.W.2d at 253.  Where the evidence is
disputed, the existence of an informal, confidential relationship is a question
of fact.  See Crim Truck & Tractor Co., 823 S.W.2d at 594.  If a
business transaction is involved, the confidential relationship must exist
prior to, and apart from, the agreement made the basis of the suit.  Associated
Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 288 (Tex. 1998). 
However, evidence of a party=s subjective feelings is insufficient, without more, to
establish the existence of a confidential relationship.  Thigpen, 363
S.W.2d at 253.  

3.         Evidence of a Confidential
Relationship








Mere
subjective trust does not transform an arm=s-length transaction into a fiduciary
relationship.  Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex.
1998).  Rather, in order to establish the existence of an informal fiduciary
relationship, the record must show that one of the parties relied on the other Afor moral, financial, or personal
support or guidance.@  Trostle v. Trostle, 77 S.W.3d 908, 915 (Tex. App.CAmarillo 2002, no pet.).  The length
of the relationship is another important factor in determining whether a
fiduciary relationship should be recognized.  Chien, 759 S.W.2d at 494
n.6 (citing Harris v. Sentry Title Co., Inc., 715 F.2d 941 (5th Cir.
1983)); Kalb v. Norsworthy, 428 S.W.2d 701, 705 (Tex. Civ. App.CHouston [1st Dist.] 1968, no writ)
(finding a fiduciary relationship where, ABy reason of appellant=s long association with appellee in a
business relationship, as well as the close personal friendship existing
between them, appellant was justified in placing confidence in the belief that
appellee would act in his best interest.@).  But even a longstanding
relationship of friendship or cordiality is insufficient, without more, to
establish an informal fiduciary relationship.  See Meyer v. Cathey, 167
S.W.3d 327, 331 (Tex. 2005) (holding that no fiduciary relationship existed
where the record showed that, although the parties were friends and frequent
dining partners, their prior projects together were arm=s-length transactions governed by
agreements that expressly disavowed the creation of any fiduciary duty); Atrium
Boutique v. Dallas Mkt. Ctr. Co., 696 S.W.2d 197, 199B200 (Tex. App.CAustin 1985, writ ref=d n.r.e.) (holding that the  trial
court properly disregarded a jury finding that appellant Bayoud shared a
confidential relationship with appellee Crow where the record reflected only
that their families had been socially acquainted for twenty-two years and
shared a Afriendly, respectful relationship,@ but that Bayoud was never guided by
Crow).  On the other hand, a close personal family relationship can give rise
to a fiduciary relationship.  Holland v. Lesesne, 350 S.W.2d 859, 862
(Tex. Civ. App.CSan Antonio 1961, writ ref=d n.r.e.) (affirming finding of a
confidential relationship where the evidence showed an Aunusually close personal friendly and
confidential relationship@ between the parties and their families in which the families
visited each other regularly, dined together, and vacationed together). 








The record
reveals both legally and factually sufficient evidence that Hasson and Lee
shared a long-standing business relationship and a close personal family
relationship well beyond casual friendship and that Lee relied on Hasson for
moral, financial, and personal guidance or support.  Moreover, their
relationship began in 1993 and therefore predated their agreements by
approximately six years.  

Although
the friendship between the two families dates back to 1993, the business
relationship between Hasson and the Pais began in 1995, when Hasson sold the
couple a $6 million life insurance policy.  The following year, the couple
purchased a second, $15 million policy from Hasson.  When the Pais purchased a
$50 million policy in 1998, Hasson became the top producing life insurance
agent for that insurer in the country, due primarily to the fact that this was
the largest life insurance policy written.  The extent to which Hasson relied
on business from Pai and Lee is evidenced in his own testimony, in which he
describes his reaction upon learning of Pai=s affair:

I remember sort of disengaging a little bit from that
news.  This was not good news, as you=ve heard, about the family
relationships and, of course, at this point in time I had also started a
business relationship with Lou and Lanna, so this was not good news for the
Hasson family or for my business with them.

(emphasis added).  Before
beginning work for Lee in October 1999, Hasson helped Lee apply for yet another
life insurance policy in August 1999.  Hasson earned commissions on each of
these sales.

The
evidence is also uncontroverted that the families were unusually close.  For
example, the Hassons and the Pais vacationed together at Lake Powell, the
Cayman Islands, and the Pais= ranches in Texas and Colorado.  Not only did the two
families vacation together, as in Holland, but as Hasson admitted, Athese two families had practically
lived together.@

In
addition, Lee depended on Hasson for personal and moral support, as evidenced
by testimony that Hasson=s attorney elicited from both Hasson and Lee:

Q:                    Was there anybody in the world
who had the relationship with Lanna Pai that would allow them to fulfill the
role that you fulfilled for her besides you?








Hasson:          I can=t imagine that there was anyone that cared and had the abilities that
she knew I had and the knowledge she knew I had about all the items, all the
topics that were important to her in her life.

. . .

Q:                    And in this darkest hour of your
life did you turn to Ted Hasson?

Lee:                Yes.  Yes, I did.  I did turn to
Ted Hasson.

Q:                    He was a rock for you, wasn=t he, [a] stabilizing influence?

Lee:                I was very vulnerable.  I neededCI looked for some support and Ted was there . . . . He
stepped in and he was there for me.

. . .

Q:                    And in this darkest hour is it
fair to say thatCthat you leaned on Ted?

Lee:                Yes.  That=s correct.  I did lean on him.

Q:                    You and he through the course of
all that we=re fixing to talk about became very close friends,
didn=t you?

Lee:                Yes.

Q:                    Much closer than you were before
when it was just the families and the vacations and the ranch and the Grand
Cayman and all that.  That really was theCwhere
you and Terry [Hasson] became close, but you and Ted really didn=t become close until you turned to him, is it fair to
say, in your darkest hour, from that point forward is where the closeness
developed?

Lee:                Yes, especially
after Lou moved out.  I turned to Ted and Ted was there and ICI confided in him.  I trusted him.

Hasson=s attorney also elicited testimony
establishing that Lee=s reliance on Hasson=s support predated any agreement
between them:








Q:                    During this period [the summer
of 1999] where you were still tryingCyou
were hopeful that the marriage might get reconciled[,] there were things that
you and  Ted were doing together, he was doing with you toCI don=t know if this
is the right way to describe it, but get your self esteem back where you knew
it needed to be, where it could be and where it should be, things of that
nature?

Lee:                I don=t know if I=d
call it self esteem.  Ted was a friend.  I looked to him.  I trusted him to
give me a lot of moral support.  As we=ve
said earlier, you know, it was the worseCit
was the worse [sic] time of my life and I was having problems with my children
andCand during our marriage Lou always made all of the big
decisions, and so when Lou left I=m
all alone and I=ve got my daughter threatening suicide, I=ve got my son in depression, too, so I turned to Ted
and Ted was there for me.

Q:                    The Be All Lanna Can Be program,
you heard that before, haven=t you?

Lee:                Yes, sir.

Q:                    What does that mean to you?

Lee:                It means that somethingCthat=s something Ted
would say to me.  TedCas I said, Ted was giving me a lot of support.  He was
there to give me emotional support and moral support and he would, you know,
try to make me feel better and punch me up and say, listen, Lanna, you know,
youCyou know, you areCyou
can be strong.  You can beCI want you to
be everything you can be and that=s
where be all you can be, sounds a little corny out of context, but that=s sort ofCsort
of like a cheer, you know, be all you can be, and, you know, he knewChe saw whatChow
difficult it was for me, you know, with this divorce . . . .

Q:                    This Be All Lanna Can Be
program, pumping you up, encouraging you, whatever is the best way to describe
that, that was going on when you and he were trying to figure out ways to
reconcile your marriage.  Right?

Lee:                Yes.  Yes.

Q:                    This way before any, let=s go find bankers and realtors and accountants and all
that.  This is a time period earlier in time.  Right?

Lee:                You know, I
believe it was.  I=m just saying, you know, once I confided in Ted that I=m having marital problems, which was
aroundCI discovered in January of >98 and I told Ted I was having
marital problems in February of >98 . . . .








These are not isolated
examples of testimony illustrating a preexisting relationship of trust and
confidence; for example, Lee=s daughter also stated that Hasson had Aalways been the father figure I
looked to for support@ and described the Hassons as family.  Hasson=s wife, whom Hasson described as Lee=s Abest friend,@ testified as follows:

Q:        Mrs. Hasson, given the closeness of the two families that you=ve described for us, there was a relationship of trust
and confidence that existed between Mr. Hasson and Mrs. Pai, or now Ms. Lee,
even before he started working for her, wasn=t
there?

A:        Trust?

Q:        A relationship of trust and confidence.

A:        Yes.  Yes.  I would say so.

Lee=s trust in Hasson was reciprocated;
Hasson testified that he trusted Lee A100 percent@ and suggested that few people knew
him as well as Lee did.  Moreover, establishing the pre-existence of a
relationship of trust was an explicit part of Hasson=s trial strategy, as illustrated by
his attorney=s opening statement: 

He takes them on vacations.  They go out to Lake
Havisaw and they go jet skiing and they goCthey spend their vacations together,
they spend Easters and Thanksgivings together, and  the families bond as
families do . . . . Now, who are you going to turn to if you find out the
person you love the most in life, that you=ve been married to for 20 some odd
years, has been dating somebody for years?  You turn to people you trust and
that you know and that you care about.  And the Hassons did what people who are
decent and honest and have integrity do.  They stand by their friends . . . .
It=s a hundred to a thousand.  That=s what we claim this man right there,
Ted Hasson, was more loyal to that woman right there, Lanna [Lee], than her own
husband.  You can argue about whether he was a hundred times more loyal or a thousand
times more loyal, but he was more loyal . . . .  








Hasson
argues that the evidence at trial showed only that Lee had subjective feelings
of trust for him and that her feelings are insufficient to establish an
informal fiduciary relationship.  See Ins. Co. of N. Am., 981 S.W.2d at
674 (holding that subjective trust, without more, is insufficient to transform
an arm=s-length transaction into a fiduciary
relationship).  However, the record contains repeated examples of objective
manifestations of Lee=s confidence in and reliance on Hasson.  In addition to the ABe All Lanna Can Be@ program described above, Lee also
shared confidential medical and significant financial information with Hasson,
and as Hasson testified, relied on him for financial guidance.  For example,
Hasson testified that on August 26, 1999Cbefore Lee made any offer of
employmentCLee asked Hasson if there were any actions she should take while she
remained married.  Hasson asked for financial information, and, at Hasson=s request, Lee supplied him with more
information than Pai ever had shared with Hasson before.  On Hasson=s advice, Lee began the process of
applying for  more life insurance.  According to Hasson, he also began to teach
Lee about diversifying her assets at this time.  Eliciting evidence that Lee
shared confidential information with Hasson also formed a part of  Hasson=s trial strategy, as demonstrated in
his attorney=s closing argument:

She shared confidential information.  If I heard it
once, I heard it a number of times.  I=m a private person.  I don=t want my business out in the public
airing, but yet we know time and time again she shared her personal
confidential financial information with Ted Hasson.  We also know she never
shared that with any other friend she described, save perhaps for her sister.

Finally,
Lee relied on Hasson for personal guidance and support in areas as important to
her as achieving reconciliation in her marriage.  For example, it is undisputed
that Lee initially did not want a divorce.  She instead relied on Hasson=s advice in joining with him to
purchase a boat for Pai in the hope that the gift would help to effect a
reconciliation:








Lee:    I believe it was about a 30 foot boat.  I was having, of
course, terrible marital problems and I didn=t
want the divorce and Ted came up with the idea and he said, well, Lanna, Lou
like[s] boat[s so] why don=t you buy him a
boat for his birthday?  Why don=t you surprise
him with a boat?  And I was thinking, I don=t
know, that=s a lot of money, and we talked about it and then Ted
came over to my home and he walks in and says, oh, by the way, I bought a
boat.  And I said, what, you bought a boat?  He said, yes, I [bought] a boat. 
Remember I said it would be a good idea to get a boat for Lou?  And since he
had bought it I felt that I should help pay for it  . .
. . and he said, well, how about you give part of the boat to Lou and
Terry [will] give part of the boat to me, meaning Ted, so it would be part Lou=s and Ted=s
boat, soC

Q:        All this family doing stuff togetherC

Lee:    Right.  And I would just say at this point, you know, I wasCI was desperately trying to keep this marriage
together and, you know, willing to do just about anything, so when Ted said,
listen, let=s try the boat, and since he had bought it I was like,
okay, Ted, you bought it, but I feel I should give you some money for it.  So
that=s how we ended up getting this boat, a 30 footCI think it=s
about 30 feet.  I don=t know much about boats . . . .

In sum,
we conclude the evidence is legally sufficient to allow a jury of reasonable
and fair-minded people to find that Lee and Hasson had a relationship of trust
and confidence before entering into the agreement at issue.  Moreover, because
such a finding is not contrary to the overwhelming weight of the evidence, it
is also factually sufficient.   

We
emphasize that fiduciary relationships are not lightly created.  See
Schlumberger Tech. Corp., 959 S.W.2d at 177.  However, the extraordinary
facts of this case present a rare example of the type of close personal
relationship of trust and confidence that gives rise to a legally cognizable
fiduciary duty.  Compare Holland, 350 S.W.2d at 862 (affirming finding
of a confidential relationship between unusually close families who vacationed
together), with Trostle, 77 S.W.3d at 915 (holding that former
stepmother did not owe a fiduciary duty to stepson who stopped speaking to her
before his father=s death and where stepson did not rely on stepmother Afor moral, financial, or personal
support or guidance.@).  We therefore hold that  the trial court erred in
disregarding the jury=s answer to Question 16.

4.         Effect
of the Error in Disregarding the Finding of a Confidential Relationship








Because
Hasson and Lee shared a confidential relationship prior to the agreement at
issue, Hasson owed Lee the duty of a fiduciary; however, evidence that Hasson
complied with his fiduciary duty was minimal at best.  This deficiency was noted
by the trial court, who observed on the record, although out of the jury=s presence, that there was no
evidence that Hasson complied with his fiduciary duty to Lee.[9] 
Nevertheless, the court stated in its final judgment that disregarding the
finding of a confidential relationship rendered the jury=s finding that Hasson complied with
his fiduciary duty immaterial.[10]  

AA trial court may disregard a jury=s finding if there is no evidence to
support the jury=s finding or if it is immaterial.@  Dunnagan v. Watson, 204
S.W.3d 30, 39 (Tex. App.CFort Worth 2006, no pet.).  AA question is immaterial when it
should not have been submitted, it calls for a finding beyond the province of
the jury, such as a question of law, or when it was properly submitted but has
been rendered immaterial by other findings.@  Se. Pipe Line Co., Inc. v.
Tichacek, 997 S.W.2d 166, 172 (Tex. 1999).  Here, however, the finding that
the parties shared a confidential relationship is both supported by the
evidence and material to the question of whether Hasson owed Lee such an
elevated duty.  Thus, the trial court erred in disregarding this finding.

This
error is harmless if a reasonable jury could have found that Hasson complied
with his fiduciary duty to Lee.  But, if the record does not support the jury=s finding that Hasson fulfilled his
fiduciary duty, then Hasson failed to overcome the presumption that his
agreement with Lee is void, and the trial court=s error in disregarding the jury=s answer to Question 16 is harmful.  See
Chien, 759 S.W.2d at 495.








On
appeal, Lee and Hasson repeat the same arguments regarding harm that were made
at trial.  Hasson argues that the jury=s finding that he complied with his
fiduciary duty to Lee renders the trial court=s alleged error in disregarding the
jury=s answer to Question 16 immaterial,
and thus, harmless.  See City of Brownsville v. Alvarado, 897 S.W.2d
750, 752 (Tex. 1995) (stating that a jury question is considered immaterial
when, inter alia, its answer cannot alter the effect of the verdict). 
In contrast, Lee contends there is no evidence that Hasson complied with his
fiduciary duty to her, and thus, the trial court=s error is harmful and requires this
court to reverse and render judgment.  Hence, in order to determine whether the
trial court=s error is harmful, we must determine whether legally sufficient evidence
supports the jury=s finding that Hasson complied with his fiduciary duty to
Lee.[11]  








As
stated, in conducting a legal-sufficiency review, we examine the entire record,
crediting favorable evidence if reasonable jurors could, and disregarding
contrary evidence unless reasonable jurors could not.  City of Keller,
168 S.W.3d at 827.  The Texas Supreme Court has described a number of such
circumstances in which a reviewing court must consider evidence contrary to the
verdict, i.e., evidence that a reasonable jury could not have ignored.  For
example, although we must Aconsider evidence in the light most
favorable to the judgment, and indulge every reasonable inference that would
support it [,] . . . if the evidence allows of only one
inference, neither jurors nor the reviewing court may disregard it.@  Id.  
More particularly, we cannot A>disregard
undisputed evidence that allows of only one logical inference.=@ Id. at 814
(quoting St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 519B20 (Tex. 2002)
(plurality op.)).  In addition, Awhen the
circumstantial evidence of a vital fact is meager, a reviewing court must
consider not just favorable but all the circumstantial evidence, and competing
inferences as well.@  Id.   AUndisputed
contrary evidence may also become conclusive when a party admits it is true.@  Id. at
815.  Moreover, we Acannot ignore undisputed testimony that is
clear, positive, direct, otherwise credible, free from contradictions and
inconsistencies, and could have been readily controverted.@  Id. at
820.  Finally, A[w]hen evidence contrary to a verdict is
conclusive, it cannot be disregarded.@  Id. at
817.  Again, the final test is whether the evidence would enable reasonable and
fair-minded people to make the finding under review.  Id. at 827.  We
will uphold the jury=s finding if it falls within the zone of
reasonable disagreement.  Id. at 822. 

B.      Compliance
with Fiduciary Duty

We begin our analysis with the charge as submitted to the
jury.  See Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000). 

Question 17 reads as follows:

Did Ted Hasson comply with his fiduciary duty to Lanna Lee?

Because (as you found in response to Question 16) a relationship of
trust and confidence existed between them, Ted Hasson owed Lanna Lee a
fiduciary duty.  To prove he complied with his duty, Ted Hasson must show:

a)       the transactions in question were fair to
Lanna Lee;

b)       Ted Hasson made reasonable use of the
confidence that Lanna Lee placed in him;

c)       Ted Hasson acted in the utmost good faith
and exercised the most scrupulous honesty toward Lanna Lee;

d)       Ted Hasson placed the interests of Lanna
Lee before his own, did not use the advantage of his position to gain any
benefit for himself at the expense of Lanna Lee, and did not place himself in
any position where his self-interest might conflict with his obligations as a
fiduciary; and

e)       Ted
Hasson fully and fairly disclosed all important information to Lanna Lee
concerning the transactions.[12]








To find that Hasson complied with his fiduciary duty to
Lee, the charge required the jury to find that Hasson proved each of the five
specified facts.  Appellants argue that there is legally insufficient evidence
to show that Hasson proved any of these factors.  We therefore examine the
record to determine if a reasonable jury could have found that Hasson complied
with his fiduciary duty to Lee, in accordance with the factors set forth in the
jury charge.  We will address our discussion of the record in a manner that
tracks the jury charge; however, because the facts set forth in the record
often pertain to more than one of the five factors required for compliance as
described in the jury charge, our placement of evidence under the various
headings is not intended to indicate that the evidence is related solely to
that factor.          1.       Were the Transactions Fair to Lee?

Texas courts apply a presumption of unfairness to
transactions between a fiduciary and a party to whom he owes a duty of
disclosure.  Fitz-Gerald, 150 Tex. at 49, 237 S.W.2d at 261.  Thus, the
profiting fiduciary bears the burden of showing the fairness of the
transactions.  Collins v. Smith, 53 S.W.3d 832, 840 (Tex. App.CHouston [1st
Dist.] 2001, no pet.).  Such fiduciaries must prove they acted in good faith
and that the transactions were fair, honest, and equitable.  Id.  In
establishing the fairness of a transaction involving a fiduciary, some of the
most important factors are: (1) whether there was full disclosure regarding the
transaction, (2) whether the consideration (if any) was adequate,
(3) whether the beneficiary had the benefit of independent advice, (4)
whether the fiduciary benefitted at the expense of the beneficiary, and (5)
whether the fiduciary significantly benefitted from the transaction as viewed
in light of circumstances existing at the time of the transaction.  Estate
of Townes v. Townes, 867 S.W.2d 414, 417 (Tex. App.CHouston [14th
Dist.] 1993, writ denied).[13]









(a)     Was the
consideration adequate or excessive?

Because a fiduciary relationship was established, the
burden rested on Hasson Ato show by evidence that [his payment]
constituted a fair and reasonable compensation for the services rendered.@  See Kalb,
428 S.W.2d at 705; see also Archer v. Griffith, 390 S.W.2d 735, 739
(Tex. 1965) (explaining that courts Ascrutinize with
jealousy all contracts [with a fiduciary]@).  Hasson argues
that the agreement was reasonable at the time it was made, referring to the
original agreement entered on January 18, 2000, under which Hasson would
receive (a) a 10% share in a partnership holding all of Lee=s assets from the
property division, (b) an annual salary equal to 1% of Lee=s share of the
marital estate, and (c) a lease on a multi-million dollar home to be
constructed at Lee=s expense.  If we accept Hasson=s contention that Lee=s share of the marital estate was
worth $140 million, then his total compensation for the first year would be
$15.4 million.  If we also accept his contention that he believed the total
marital estate to be worth $75 million at the time of the initial agreement,
before the value of Enron stock increased, then his anticipated compensation
would have been $4,702,500.[14]  








We find
no evidence in the record to support Hasson=s contention that even the lesser
amount constituted  fair and reasonable compensation for his services.  To the
contrary,  the agreement between Hasson and Lee compensated Hasson
disproportionately to the services he was qualified to perform or actually rendered. 
For example, the record shows that Hasson dissuaded Lee from retaining family
law attorney Donn Fullenweider on the grounds that Fullenweider=s fee schedule was unreasonable.  A
copy of Fullenweider=s proposed retention agreement is in the record and places
this contention in context.  Fullenweider is board certified in both family law
and civil trial law, a Fellow of the American Academy of Matrimonial Lawyers,
and a member of the American Board of Trial Advocates.  Fullenweider=s contract specifies that, to retain
his services, Lee would be required to pay a $10,000 acceptance fee and  a
$15,000 deposit, against which costs and Fullenweider=s fees of $500 per hour would be
billed.  At these rates, Fullenweider would have to work twenty-four hours per
day, seven days per week, for more than three and one-half years to earn the
$15.4 million Hasson claimed Lee is ultimately obligated to pay.  We further
note that if Hasson had been employed under the same terms he rejected as
unreasonable when offered by Fullenweider, then the $4.22 million Hasson
already has received would include overcompensation of approximately a million
dollars, even if he had worked twenty-four hours per day every single day of
his employmentCyet this $4.22 million sum is nearly half a million dollars less than
the compensation Hasson contends he anticipated at the time of the original
agreement.

As
Hasson=s attorney stated in closing
argument, ANow there is another truth that=s inescapable.  Man, that was a
pretty rich deal.  That was a pretty fat hog.  That=s a fairBthat=s a fair truth . . . .@  We agree with counsel=s apt characterization: it is an
inescapable truth that the contract at issue is Aa pretty fat hog.@  But rather than disclosing that his
compensation far exceeded the value of the services he was qualified to render,
Hasson gave Lee opinions on tax and legal matters predicated on an admitted
misunderstanding of the law,[15] relied on
advice from friends and acquaintances without regard to their qualifications
and at additional cost to Lee,[16] and, at
times, even dissuaded Lee from seeking independent advice from qualified
professionals.[17]








Hasson
argues that his compensation is fair because he increased the value of Lee=s share of the marital estate by
advising Lee to pressure Pai into exercising his Enron stock options and
selling shares of Enron stock when its value was high.  Lee agrees that she did
ask Pai to sell the stock, and it is undisputed that Pai sold thousands of
shares worth millions of dollars.  But the fact that Pai sold the shares is
subject to competing inferences.  Although the jury might have inferred that
Pai sold the shares in response to Lee=s request that he do so, it is
equally likely that Pai, an Enron executive with advanced degrees in economics
and who all parties agree had made all previous financial decisions in his
twenty-three year marriage, continued to make such decisions independently.[18]  
See City of Keller, 168 S.W.3d at 813 (AWhen the circumstances are equally
consistent with either of two facts, neither fact may be inferred.@).  The possible inference that Pai
acted indirectly on advice that Hasson rendered as part of his agreement with
Lee is no more than speculation.  For example, Hasson admits that he told Lee
in August 1999Cbefore any
agreement between the partiesCthat the Pai marital estate held a disproportionate share of
its assets in Enron stock and needed to diversify.  Lee agrees that, based on
Hasson=s advice, she asked Pai to sell some
stock, and the record supports an inference that she made the request at the
end of January 2000; however, Pai exercised options and sold stock over a
period of many months, and the evidence does not indicate a pattern linking
these actions to requests by Lee.  Moreover, the options and shares were
community property, and Lee=s ownership interest in these marital assets was the same
whether the assets were held in the form of unexercised stock options, shares,
or cash.  Hasson did not increase the value of these securities, and although
Pai=s timing in selling these assets
prevented the community estate from diminishing in value when the price of
Enron stock later plummeted, a reasonable jury could not find, by a
preponderance of the evidence, that Pai=s sales decisions are attributable to
Hasson. 








We also
note there is no evidence that Hasson=s services assisted Lee in obtaining
a greater share of the marital estate than she would have received without his
services.  Ultimately, Lee received just over 57% of the marital estate, but
the obligation to pay Hasson 10% or 11% of the estate, if enforced, would
reduce her share to less than 50%.  Thus, under the contract he describes,
Hasson would benefit at Lee=s expense, as he essentially admits:

Q:        If it is true that she was going to receive 50 percent of the
estate no matter what, if she has to pay $14 million to you, she will not end
up with 50 percent of the estate, will she?

A:        As it stands today, that=s correct.

See City of Keller, 168 S.W.3d at 815 (AUndisputed contrary evidence may also
become conclusive when a party admits it is true.@).     

There is
also evidence in the record that Lee could have used the services of a divorce
attorney and retained more than 50% of the marital estate even after payment of
legal fees,  but there is no evidence that Hasson told Lee that others could
perform his services at a lower cost.  Although Hasson testified that he did not
know that others could perform his services at a lower cost, he also testified
that the first task Lee asked him to perform was to devise a fair compensation
scheme:

Actually, Lanna had a brilliant idea and it helped me
in coming up withCyou know, I guess my first job was to come up with my
compensation.  Actually, that wasCthat=s what she told me.  She told me to go
figure out something that was fair, okay, but there was something that
Lanna wanted.  She said, look, I want a deal whereby you are just as motivated
to do well at what you are doing.  Okay.  AsCin other words, she didn=t want me to just be working to where
I=m benefit[t]ing.  She wanted me to
work to where if I benefit[t]ed, and mainly if she benefit[t]ed then I would
benefit proportionately.  In other words, if what we did was good, it would be
good for both of us.  And so she wanted me to come up with an idea that
basicallyCifCthat it had to be good for both of
us.  That=s the bottom line.          

(emphasis added). 
Neither the January 18, 2000 agreement nor the May 3, 2000 modification
satisfied Lee=s requirements that the terms of the agreement be Afair@ and Agood for both [Lee and Hasson],@ nor is there evidence in the record
that Hasson took any steps to determine whether the compensation schemes he
proposed or accepted were fair to Lee. 








For
these reasons, as well as those discussed below, a reasonable jury could not
have concluded that the transactions were fair to Lee.

(b)       Did Hasson significantly
benefit from the transactions as viewed in light of circumstances existing at
the time of the transactions? 

When
viewed in the light of circumstances existing at the time of the transaction,
Hasson=s significant benefit from the
transaction was unquestionably his extraordinary compensation.  Thus, we need not
repeat our discussion of this factor, but incorporate that discussion by
reference as set out in section III(B)(1)(a), supra.

(c)       Did
Lee have the benefit of independent advice?

Hasson
does not dispute that there is no evidence in the record that Lee received the
benefit of independent advice regarding her agreement with Hasson.  Rather,
Hasson testified at trial that Lee refused to obtain independent advice because
she chose to keep their agreement secret:  

Q:        By the way, Mr. Hasson, who did you take Ms. Lee to in order
to have your contract with her determined to be fair and reasonable?

A:        I offered to have that document put in writing.  And when she
said she didn=t want it in writing then I asked, well, why don=t we talk to Faye, your sister, your confidant.  She
said she did not want anyone else to know.

Q:        So the answer is, no one.  Correct?

A:        That would be no one.

Q:        You did not take her to any other financial planner, insurance
person, real estate agent, lawyer, candlestick maker, anybody else to give her
an opinion about whether the agreement that you say you reached with her was
fair and reasonable for her, did you, sir?

A:        You=re right.  I honored her request.








But Hasson=s offer to have the initial agreement
reduced to writing is no evidence that he fulfilled his fiduciary duty; the
issue actually tried was whether Hasson was due compensation under the modified
contract, and he does not contend that he offered to have that modified
agreement memorialized in writing.  More importantly, Hasson testified that Lee
did not want the agreement reduced to writing because she was concerned that a
written contract would be discoverable in the divorce suit; however, Hasson
failed to refer her to an attorney for legal advice on this issue or to advise
Lee that her stated reason for avoiding a writing is invalid.  See Tex. R. Civ. P.  192.3 (AIn general, a party may obtain
discovery regarding any matter that is not privileged and is relevant to the
subject matter of the pending action, whether it relates to the claim or
defense of the party seeking discovery or the claim or defense of any other
party@).  Accordingly, Lee=s lack of independent advice is due
in part to Hasson=s failure to disclose these important facts.[19]

We
further note that Hasson actively dissuaded Lee from seeking qualified
independent advice on more than one occasion.  For example, both Hasson and his
wife admitted that, at times, Lee wanted to use the services of a divorce
attorney, and Hasson persuaded her to continue to pursue a mediated divorce
without a lawyer.  Moreover, Hasson offered evidence that he advised Lee not to
retain family law attorney Donn Fullenweider based on the size of the fee
Fullenweider would purportedly charge, although Hasson admitted at trial that a
divorce attorney would not charge Lee as much as Hasson charged.

Because
the record contains no evidence that Lee received the benefit of independent
advice, a reasonable jury could not have made this finding on the record before
us. 

2.         Did
Hasson Make Reasonable Use of Lee=s Confidence?








Hasson
frequently recommended that Lee obtain advice from those with whom Hasson
himself had a relationship, regardless of the person=s qualifications to render the advice
sought.  For example, Pai had purchased a ranch in Colorado, and Lee
anticipated that the value of the ranch would be a point of contention in
negotiating an equitable property division.  Hasson was acquainted with Jim
Barron, the real estate agent who had handled the purchase, and Hasson
suggested that Lee obtain an opinion on the value of the ranch from Barron. 
Hasson did not review Barron=s resume, and Barron is not a certified appraiser.  On
October 26, 1999, Barron wrote Lee that, in his opinion, the land was worth
approximately $850 per acre.  The following day, Barron again wrote to Lee,
revising his earlier opinion.  In his second letter, Barron stated that a
lawsuit affecting the ranch Ais pivotal in the value of [the ranch] in that it affects
title.@  Barron opined that the ranch had
increased in value by only $100 to $150 per acre from the time of purchase. 
Hasson did not have the ranch appraised and stated at trial that he had no idea
whether the information on which Barron based his opinion was correct. 
Although Hasson argues that he strengthened Lee=s bargaining position in the mediation
by suggesting that she obtain Barron=s opinion, the ranch was actually
valued in the AID at its capitalized cost, and there is no evidence that Barron=s opinion had any effect on that
valuation.  On this evidence, a reasonable jury could not conclude that Hasson=s failure to have the property
appraised was a reasonable use of the confidence placed in him.[20]









Hasson
also recommended that Lee use the services of his own accountant and longtime
associate, Raleigh Bailes, although Lee already was represented by accountant
Victor Harris.  Hasson and Lee did not inform Harris of their agreement, but
according to the testimony of both Hasson and Bailes, Lee discussed the
contract with the accountant hired by Hasson.  There is no evidence in the
record that Hasson recommended to Lee that the existence of their contract be
disclosed to Harris, who is the only person identified in the record as
attending and advising Lee at the divorce mediation.  Hasson also referred Lee
to his own former employer to obtain financial planning advice, but there is no
evidence that Hasson disclosed to the financial planner that Lee was obligated
to pay Hasson both a fixed and a continuing share of the marital estate or that
he recommended that Lee make such disclosures.[21] 
As a result, neither the accountant representing Lee in property settlement
negotiations nor the financial planner Hasson recommended considered Lee=s largest contractual obligation in
making financial recommendations to her.  In sum, a fair-minded jury could not
conclude, based on this evidence, that Hasson made a reasonable use of Lee=s confidence in him.

Hasson
also failed to respond appropriately to Lee=s concerns.  At a meeting with Hasson
and Bailes on May 19, 2000, Lee expressed concerns about a temporary
restraining order or Aasset freeze.@  Hasson discussed what he described as the Ashenanigans@ of the judge presiding over the
divorce and suggested the judge had Aa history@ of freezing marital assets in
divorce cases.  Although Hasson admitted at trial that he does not know the
legal requirements to obtain a restraining order, he did not suggest that Lee
contact an attorney who could address those concerns.  Nevertheless,  in the
same meeting, Hasson arranged for a law firm to prepare documents establishing
a family limited partnership in which B. Lanna, Inc. would be a partner.  These
documents listed Hasson as a 10% owner of B. Lanna, Inc., although there is no
evidence in the record that, at the time these documents were requested or
prepared, Lee agreed that Hasson would own 10% of the corporation.  A
fair-minded jury could not disregard this evidence that Hasson did not make
reasonable use of the confidence Lee placed in him.[22]  

3.         Did
Hasson Exercise the Utmost Good Faith and Most Scrupulous Honesty?








There is
further evidence that Hasson not only failed to make reasonable use of Lee=s confidence and failed to disclose
material facts but also failed to exercise the utmost good faith and scrupulous
honesty.  For example, although Hasson correctly points out that he dealt with
third parties such as bankers, accountants, real estate brokers, attorneys, and
contractors on Lee=s behalf, he did not uniformly conduct these dealings with
the utmost good faith and scrupulous honesty required of him.  To the contrary,
he allowed accountant Bailes to bill B. Lanna, Inc. for work performed solely
on Hasson=s behalf.[23]   Hasson
also executed contracts, ostensibly on Lee=s behalf, that exceeded the scope of
his authority, and falsely represented that he was acting under a power of
attorney from Lee.   In one instance, Hasson admitted that after his contract
with Lee was modified on May 3, 2000, the Dunsinane House no longer formed part
of his compensation.  Nevertheless, Hasson entered a contract on May 4, 2000
for the construction of a pool at the house.  Moreover, he indicated on the
signature line of the contract that he was acting under a power of attorney for
Lee; however, there is no evidence in the record that Hasson had a power of attorney
permitting such actions at that time.[24]  There also
is no evidence that Hasson disclosed to Lee his intent to execute contracts on
her behalf regarding the Dunsinane House after the property no longer formed
part of his compensation.  See Home Loan Corp. v. Tex. Am. Title Co.,
191 S.W.3d 728, 731 (Tex. App.CHouston [14th Dist.] 2006, no. pet. h.) (sub. op. on reh=g) (AOrdinarily, a fiduciary duty of full
disclosure requires disclosure of all material facts known to the fiduciary
that might affect the rights of the person to whom the duty is owed.@).  On these undisputed facts, a
reasonable and fair-minded jury could not have found that Hasson exercised the
utmost good faith and most scrupulous honesty required of him as a fiduciary.








4.         Did Hasson Place Lee=s Interests Before His Own, Refrain
from Using the Advantage of His Position to Benefit at Lee=s Expense, and Refrain from Placing
Himself in Any Position in which His Self-Interest Might Conflict with His
Obligations as a Fiduciary?

(a)       Did Hasson place Lee=s interests before his own?

The
record also establishes that Hasson participated in transactions in which he
benefitted at Lee=s expense and did so without regard to whether the
transaction was beneficial to Lee.  For example, Hasson helped Lee obtain a
loan in October 1999, although Pai already had arranged a loan for Lee.  But 
there is no evidence in the record that the terms of the loan arranged by
Hasson were more beneficial to Lee than the loan arranged by Pai.  To the
contrary, the transaction arranged by Hasson included a $120,000 payment to a
company Hasson controls, although there is no evidence in the record that the
company rendered any service in exchange for the payment.[25] 
On this record, a reasonable jury could not conclude that Hasson placed Lee=s interests before his own.[26]

(b)       Did Hasson refrain from
using the advantage of his position to benefit at Lee=s expense?








In
addition to the issues of compensation previously discussed, the record
contains further evidence that Hasson used his position to benefit at Lee=s expense.[27] 
For example, during the course of his agreement with Lee, Hasson applied for
additional life insurance on his own behalf.  In connection with this
application, Hasson was required to provide information regarding his net
worth.  Bailes provided the information, and, incorrectly assuming that Hasson
was seeking Akey man@ insurance benefitting B. Lanna, Inc., Bailes billed the work to B.
Lanna, Inc.  Lee eventually paid the bill.  Because work solely benefitting
Hasson was billed to B. Lanna, Inc. and paid by Lee, Hasson directly benefitted
at Lee=s expense; however, there is no
evidence that Hasson reimbursed Lee or the corporation or even disclosed these
practices to Lee.  See City of Keller, 168 S.W.3d at 810B11 (noting that reviewing courts do
not disregard contrary evidence if there is no favorable evidence or
conclusively establishes the opposite of the fact the jury was asked to
find).   Moreover, the evidence shows a pattern in which work requested by
Hasson was billed to B. Lanna, Inc. and paid by Lee.  In April of 2000, Hasson
traveled with Lee to Hawaii, where Lee was interested in buying property. 
Hasson acted as a liaison between Lee and her banker, real estate attorney,
real estate agent, and title company.  Hasson also sought advice from Bailes about
the tax consequences if Lee were to buy a house in Hawaii for $12 million and
sell it to Hasson for $7 million.  Bailes advised Hasson that Lee would not be
able to deduct the loss as a legitimate business expense.  Although Hasson
requested this information, Bailes billed B. Lanna, Inc. for this work, and
again, Lee eventually paid the bill.[28]  

(c)       Did Hasson refrain from
placing himself in any position in which his self-interest might conflict with
his obligations as a fiduciary?

Hasson=s own testimony illustrates that he
placed his self-interest above his fiduciary duty to Lee: 








The situation you heard about [Lee=s son B.P.] kind of created theCwell, she was concerned about
liability.  Right, wrong or indifferent, there was a definite worry
about now that she was getting money thisCher son couldCI mean, there were realCshe gave me lots of reasonsCgave me a lot of reasons why this was
a concern to her, but the bottom line was she was afraid that she would get
sued.  And now she has some money or now she=s going to have some money . . . . 
So in my business I knew a little bitCI had learned a little bit about
limited partnerships and how clients use them as an asset-protection vehicle,
so kind of from that thought I said, you know what, what we could do is
create a partnership, a 90/10 partnership.  You be the owner.  You be the
controller, still the boss, but our deal will be a 90/10 partnership.  And I
said, and we=llCand we canCas soon as you get your assets, as
soon as your estateCyou come into possession of your estate we=ll create that partnership and the
paperwork, all the legal paperwork.  I said, but listen, that means I have
to wait until the very end . . . .  Anyway, the point is that I told her,
now look, in orderCin order for you to have the absoluteCand the absolute confidence that any
advice that I give you is not biased then there has got to be something in here
that takes care of me and makes me feel good about working this hard for you
during this time period.  

(emphasis added).  Hasson
did not advise Lee that her concerns about liability for her adult son=s actions could be Aright, wrong, or indifferent,@ nor did he refer her to a
professional able to address her concerns.  Rather, he proposed a partnership
with himself, in which he would acquire a 10% interest in Lee=s property.  The record contains no
explanation regarding how Lee could be protected from liability or otherwise
might benefit by giving Hasson a 10% partnership interest in her share of the
marital estate.  To the contrary, the record demonstrates that Hasson would
benefit from the transaction at Lee=s expense. 

Hasson
further testified:








And so I said, look, the 90/10, that=s fine, but that=s down the road whenever that
happens, that partnership.  I said, so here=s my idea.  Look, we just didCyou just bought that $3,000,000.00
condominium . . . . I said, we can use that same concept to
get a home that you would invest in that you would own.  It will beCin fact, she even gave meCDunsinane was right close to where
she and Lou used to live . . . . She didn=t help pick the
site . . . . But when we went over there, Lanna said, hey,
this is a great spot.  Absolutely.  This is a good deal.  And she saw the job
being built being gorgeous . . . . She started getting the idea about Dunsinane
to be like a headquarters.  In fact, I think you heard Mr. Bailes talking about
that because it was going to be like a Houston headquarters.  Because Lanna=s plan, in her heart, was in Hawaii
where she had loved once and whatnot.  So her heart was in Hawaii, and so she
was planning on spending a lot of time . . . . back and forth, and therefore
was going to beCthis house was huge.  No problem.  Lanna was going to live
with us as well in Dunsinane,[29] so that=s why she liked the area.  She liked
the house, was goingCwas involved with it . . . .

(emphasis added).  Thus,
in addition to proposing the partnership, Hasson also proposed that Lee build a
house where the Hassons would live.  As he continued his testimony, Hasson
explained the purpose of the house:

Q:        Well, let=s get down to
the nitty-gritty.  Did y=all reach an agreement?

A:        Oh, weCyes.  Yes, butCand the pointCnow I remember.  The point was
that this house with me and Terry living in it was going to be the
remuneration, the benefit that I got no matter what.  In other words, if thisCif this thing went to trial and Terry
and I were going to have to live through this andCand waitCwait for any money toCyou know, >til the end of her divorce, the home
was going to be our benefit and it was going to be structured in the form of basically a
rental payment at the value of 10 percent of the value of that house.  And the
house was about $2.6 million, so the rent I was going to owe Lanna was going to
be $260,000.00 a year, 10 percent.  Okay?  The benefit to me was going to be
that Lanna was going to carry that and deduct it from the salary that I was
goingCthat she was going to give me from B Lanna, Inc., the salary
equal to 1 percent of the value of what she got in the end, see?  So ifClet=s say she got a hundred and forty
million dollars.  One percent of a hundred and forty million dollars would be
$1,400,000.00.  That was going to beCthat would have been my salary . . .
. That=s what I was going to get, and that way I was never
going to be biased on whatever . . . . So the 260, the rent, the 260 would come out of and
be deducted from the 1.4 million that I was going to get as my salary from the
partnership . . . .








(emphasis added).  
Hasson did not disclose to Lee that, by granting Hasson a 10% interest in a
partnership holding her entire share of the Pai marital estate, Lee was
overcompensating Hasson for any services he was qualified to render.  To the
contrary, he proposed that Lee pay him additional compensation in the
form of a salary, part of which was to be paid in the form of a deduction for
rent, to give Lee Aconfidence that any advice [Hasson rendered] is not biased.@  However, as a fiduciary, Hasson had
a preexisting obligation to refrain from transactions with Lee that were
biased.  This, too, was not disclosed to Lee.  

In
proposing and accepting Lee=s purchase and his own rental of the Dunsinane House as a
part of his compensation, Hasson placed himself in a position in which his
self-interest might conflict with his obligations as a fiduciary in other ways
as well.  This is illustrated by Hasson=s testimony regarding Lee=s proposed purchase of the
multi-million dollar Foundation House in Hawaii for the purpose of leasing it
to others.  Her real estate broker, Glen Fujihara, testified that Hasson
investigated whether the purchase would be beneficial to Lee:

Q:        Did you think that he [Hasson] was sincerely interested in
understanding the positives and negatives about purchasing this property on
Lanna=s behalf?

A:        Yes.

Q:        Was he looking out for her interests?

A:        Yes.

However, as Hasson
admitted, he did not believe the transaction could be profitable:

Now LannaCLanna wasCwhen this house [Foundation House]
was bought, Lanna and [real estate broker] Glen Fujihara were thinking that
this was going to be like a rent house . . . . I was addressing the business. 
I was concerned because when I kind of crunched some numbers I didn=t see any way in the world a $3.2
million house could make any money as a rent house, and I went over that with him.  And
he is a very good friend of Lanna=s and had convinced Lanna that thisCthat this rental program could or
would actually make money.  I didn=t get that.  Okay.  SoCbut ICit was something Lanna wanted to do. 
And this is a good example, actually, on of [sic] her being the boss.  She
wanted to do it.  She said, help me get this done.  That=s what I did.








(emphasis added). 
Despite Hasson=s belief that the purchase was not beneficial to Lee, there is no
evidence that Hasson discussed his reservations with her or otherwise advised
her that it would be unprofitable to buy the house for the purpose of leasing
it to others.  Significantly, however, this is the same arrangement that Hasson
himself had previously obtained with regard to the Dunsinane House, i.e., that
Lee buy or build a multi-million dollar home for the purpose of renting it.  As
with the Foundation House in Hawaii, there is no evidence that Hasson advised
Lee that this arrangement could be unprofitable for her.[30]

5.         Did Hasson Fully and
Fairly Disclose All Important Information to Lee Concerning the Transactions?








            Although the
record contains many examples of Hasson=s failure to fully and fairly
disclose important information to Lee, perhaps the earliest and most
significant such failure relates to Hasson=s failure to disclose his lack of
qualifications to advise or assist Lee regarding the Abest property division and settlement
possible@ as he agreed to do.  Hasson is not
an attorney, and there is no evidence he consulted an attorney in making his
settlement recommendations.  Hasson also testified that he consulted no learned
treatises and conducted no legal research in advising Lee.[31] 
Hasson also is not a certified appraiser and did not consult a certified
appraiser to evaluate property of disputed worth.  Although Hasson did not
represent himself to be an attorney or an appraiser, a fiduciary does not
comply with his duty solely by refraining from affirmative misrepresentations
such as the representation that the fiduciary is actually licensed or qualified
to perform legal or appraisal tasks; rather, a fiduciary breaches his duty
where he fails to fully disclose important facts.  Here, the record
demonstrates that Hasson did not advise Lee that he not only lacked the
required licenses, but also lacked the skills necessary to accomplish the tasks
he agreed to perform.[32] 








Another
example of Hasson=s failure to fully and fairly disclose important information
to Lee concerns the formation of B. Lanna, Inc.  Hasson testified that the
company was created for unspecified tax reasons and to insulate Lee=s assets from her adult son=s judgment creditors, if any.  But
Hasson=s suggestion that Lee form a limited
liability company to protect her assets does not constitute evidence that
Hasson complied with his fiduciary duty because he produced no evidence that
forming such a company was either necessary or sufficient to protect Lee from
liability.  There is no evidence in the record that Hasson sought to determine
whether Lee would face any legal liability for the actions of her adult son, or
explained to her the limits of any such liability.  Moreover, even assuming
that Lee faced such liability, there is no evidence that Hasson=s proposed solution was an
appropriate or effective one.  A corporate entity can be disregarded and its
shareholders held liable if the corporation is the mere alter ego of its owner A[as] shown from the total dealings of
the corporation and the individual, including the degree to which corporate
formalities have been followed and corporate and individual property have
been kept separately, the amount of financial interest, ownership and
control the individual maintains over the corporation, and whether the corporation
has been used for personal purposes.@  Castleberry v. Branscum, 721
S.W.2d 270, 272 (Tex. 1986) (emphasis added); see also Tex. Bus. Corp. Act Ann. art.
2.21(A)(2) (Vernon 2003) (permitting a shareholder to be held liable for
matters relating to or arising from the contractual obligations of the
corporation if the shareholder is the alter ego of the corporation and used the
corporation for perpetrating fraud for the shareholder=s benefit) (now recodified in
sections 21.223B.226 of the Texas Business Organizations Code, Act of May 13,
2003, 78th Leg., R.S., ch. 182, ' 1, 2003 Tex. Gen. Laws 267, 427B28).  It is undisputed that, as a
signatory to bank accounts belonging to the corporation as well as Lee=s own bank accounts, Hasson
authorized funds to be transferred from Lee=s personal account to the B. Lanna,
Inc. account for the purpose of paying Hasson an amount allegedly owed only by
Lee.  By funneling payments for personal debts through the corporation, Hasson
may have weakened the ability of B. Lanna, Inc. to shield Lee from liability.  See
Castleberry, 721 S.W.2d at 272.  There is no evidence that Hasson disclosed
the possible consequences of these actions to Lee.[33]

Although
Hasson admits that he advised Lee on tax matters and on ways to insulate
herself from liability, there is no evidence in the record that Hasson was
qualified to do so or that he disclosed his lack of qualifications.  Instead,
as Hasson admitted at trial, he incorrectly advised Lee that funds she paid him
to advise her on the marital property division were tax deductible:

Q:        You have represented to my client [Lee] that any amounts of
money paid to you, that you=re suing for in
this lawsuit, would be tax deductible.  Correct?

A:        I believe I did.

Q:        You understand, of course, that expenses incurred associated
with procuring a divorce are not tax deductible; do you not?








A:        I do know that.

Q:        And I take it by your answer that you know it now but you
didn=t know it then.  Or did you know it then, too?

A:        I think it came up inCin
the meeting.  But I don=t remember when I had that knowledge.

. . .

Q:        You understand that you=re
[sic] representation to Ms. Lee that she would be able to deduct any fees of
any kind associated with getting a divorce from her income taxes, that was
incorrect.  You know that, don=t you?

A:        Yes.  I do.

Q:        If you know it=s
incorrect, why did you put it in the letter?

A:        I think I made a mistake.

See City of Keller, 168 S.W.3d at 815 (noting that
undisputed evidence contrary to the jury=s finding may be conclusive when a
party admits it is true).  The record contains no evidence that Hasson
disclosed this mistake to Lee.     








On
appeal, Hasson argues that the evidence is sufficient to support the jury=s finding that he satisfied his
fiduciary duty to Lee because Lee herself chose the terms of their May 3, 2000
modification to the agreement.  This argument focuses solely on the language
modifying the contract proposed by Lee on May 3, 2000 and implicitly rests on
the assumption that the fairness of a transaction can be demonstrated by
evidence that the principal chose the terms by which property was promised or
conveyed to a fiduciary.  Appellees cite no authority for this proposition, although
we note that this argument might have some validity where the property at issue
is a unilateral gift to the fiduciary rather than compensation for services
rendered or promised.  See Vogt v. Warnock, 107 S.W.3d 778, 784B85 (Tex. App.CEl Paso 2003, pet.
denied) (holding that a competent transferor=s voluntary gift
to a fiduciary is fair as a matter of law).   Here, however, we direct our concerns not to a unilateral
act such as a gift but to the agreed exchange of performances.  The majority of
Hasson=s services were rendered before May
3, 2000, under terms that he proposed and Lee accepted, and in determining the
fairness of the agreement, we are not free to disregard his course of conduct
if reasonable jurors could not.  See City of Keller, 168 S.W.3d at 827
(stating standard of review).  Specifically, the jury was required to consider
those factors set forth in Jury Question 17 and determine not only whether the
transaction was fair, but also whether Hasson made reasonable use of Lee=s confidence, acted with the utmost
good faith and scrupulous honesty toward her, placed Lee=s interests above his own, abstained
from using his position for personal benefit at Lee=s expense, refrained from placing
himself in a position in which his self-interest might conflict with his
fiduciary obligations to her, and fully and fairly disclosed all important
information to Lee concerning the transactions.  On the record before us, the
jury could not conclude that  Hasson satisfied these requirements, either
before or after May 3, 2000, without disregarding the contrary evidence that a
reasonable and fair-minded jury was obliged to consider. 

Hasson
similarly argues that his offer to allow Lee to renegotiate the terms of their
agreement after the value of Enron stock increased in January 2000 constitutes
evidence that he complied with his fiduciary duty.  As further proof of his
fulfillment of his duty, he relies on evidence that Lee proposed the terms of
the May 2000 contract modification.  But there is no evidence that in any of
these conversationsCwhether proposing the original compensation scheme, offering
to renegotiate the terms, or discussing Lee=s proposed contract modificationCHasson fully and fairly disclosed the
material facts Lee needed to consider in making those choices.  

After
reviewing the record in the light most favorable to the jury=s finding, crediting favorable
evidence if reasonable jurors could and disregarding contrary evidence unless
reasonable jurors could not, we conclude that a reasonable jury could not have
found that Hasson fully and fairly disclosed all important information
concerning the transactions at issue to Lee.








C.        Hasson=s Remaining Argument that He Complied
with His Fiduciary Duty

In sum,
Hasson argues he complied with his fiduciary duty because the evidence shows:
(1) Lee chose the terms of the initial agreement from among the three
compensation schemes he proposed, (2) he offered to have the initial
agreement reduced to writing, (3) he offered to allow Lee to renegotiate
the terms of the agreement after the value of Enron stock increased in January
2000, (4) Lee proposed the modification of the agreement, (5) Hasson suggested
that Lee consult her sister about the agreement, (6) he urged Lee to establish
a limited liability company to protect her assets, (7) he introduced Lee to
bankers, accountants and attorneys, and dealt with third parties such as real
estate brokers on her behalf, (8) the jury implicitly rejected Lee=s evidence that others would charge
approximately $50,000 for the services he rendered to Lee, and (9) the deal was
fair at the time it was made.[34]  We have
addressed all but one of these arguments, leaving only Hasson=s contention that the jury Aimplicitly@ rejected Lee=s evidence of the lower amount others
would charge for the services Hasson rendered to her.

The
logic of this argument is circular.  Hasson argues that the jury could not have
answered Question 17 affirmatively and found that Hasson complied with his
fiduciary duty to Lee unless it found that the transaction was fair.  He
therefore reasons that since the jury found the transaction was fair, the jury
also must have rejected Lee=s evidence that Hasson=s services were worth approximately
$50,000.  But the finding that Hasson complied with his fiduciary duty is the
same finding that appellants challenge; thus, this argument begs the very
question under review.  Moreover, the presumption that the jury rejected the
evidence that Hasson=s services were worth $50,000 is not evidence that his
services were worth millions, or that Hasson proved the other facts the jury
was instructed to find. 








D.        Harm Analysis

The
evidence favorable to the challenged finding is legally insufficient, and the
contrary evidence that a reasonable jury could not disregard is conclusive.  On
the record before us, we hold that a reasonable juror could not find that
Hasson complied with his fiduciary duty to Lee.  Consequently, Hasson has
failed to overcome the presumption that his contract with Lee is void.  See
Chien, 759 S.W.2d at 495 (AAll transactions between the fiduciary and his principal are presumptively
fraudulent and void . . . .@).  Stated another way, Hasson failed to meet his burden at
trial to prove that his contract with Lee is valid.  See id. (stating
that Athe burden lies on the fiduciary to
establish the validity of any particular transaction in which he is involved.@).  The trial court=s judgment disregarding the existence
of the confidential relationship between Lee and Hasson therefore constitutes
reversible error. 

IV.  Conclusion








Having
reviewed the record under the applicable standard of review, we hold there is
legally and factually sufficient evidence that Lee and Hasson had a preexisting
relationship of trust and confidence, and there is legally insufficient
evidence that (a) the transactions at issue were fair to Lee;
(b) Hasson made a reasonable use of the confidence Lee placed in him;
(c) Hasson acted with the utmost good faith and exercised the most
scrupulous honesty toward Lee; (d) Hasson placed Lee=s interests before his own, did not
use the advantage of his position to gain any benefit for himself at Lee=s expense, and did not place himself
in a position in which his self-interest might conflict with his obligations as
a fiduciary; and (e) fully and fairly disclosed all important information
to Lee concerning the transactions.  We therefore sustain appellants= first issue,[35]
overrule appellees= cross-point, and reverse and render judgment that appellees
take nothing.[36]

 

 

 

 

/s/        Eva M. Guzman

Justice

 

 

 

Judgment rendered and Opinion filed January 30, 2007.

Panel consists of Chief Justice Hedges and Justices
Yates and Guzman.









[1]  The jury found that Lee and Hasson had an oral
agreement, and in reviewing the evidence on the legal sufficiency issues in
this appealCi.e., whether a reasonable jury could have found that
Hasson and Lee had a preexisting confidential relationship and Hasson fulfilled
his fiduciary duty to LeeCwe assume that jurors decided questions of credibility
or conflicting evidence in favor of the verdict if they reasonably could do
so.  See City of Keller v. Wilson, 168 S.W.3d 802, 819, 820 (Tex.
2005).  Accordingly, our recitation of the facts credits favorable evidence if
reasonable jurors could, and disregards contrary evidence unless reasonable
jurors could not.  See id. at 827. 





[2]  The check was payable to H.I.D., Inc. 





[3]  Pai testified that his son has a bipolar disorder. 
According to Hasson, AAt one point in time, [B.P.] was in a car accident in
Florida.  And I think the person driving the car that he was in was killed.
[Lee] told me that it was well documented, [B.P.]=s challenges were well documented and that they had bought him a brand
new BMW and that she felt like if he were to hurt somebody that sheCthat theyCnow
that she hadChad some money, or when she got some moneyCI guess this was actually before she got money when
she was talking, told me about this.  She said that she was worried that it
would be easy to prove that she and Lou knew about [B.P.]=s challenges and that maybe somehow they=d beCthey could be
sued and held liable because they gave him the keys to the car.@ 





[4]  Lee was still using the name Lanna Pai at that time.





[5]  See section III(B)(1)(a), infra.





[6]  At trial, Hasson testified that Lee owed him 10% of
her marital state, plus an additional 1% of Lee=s share of the estate as salary.  During closing arguments, however,
Hasson=s attorney did not urge the jury to award the
additional 1% salary.





[7]  Appellant B. Lanna, Inc. and appellees H.
International Distribution, Inc. a/k/a Hasson International Distribution, Inc.
and Diversified Financial Enterprises are not alleged to be parties to the
contract between Lee and Hasson; however, the judgment held B. Lanna, Inc.
jointly liable on the contract, and allowed Hasson=s companies to share jointly in the recovery. 
Although appellants challenge this aspect of the judgment, we do not reach this
issue.





[8]  See Tex.
R. Civ. P. 324(c) (AWhen judgment
is rendered non obstante veredicto or notwithstanding the findings of a jury on
one or more questions, the appellee may bring forward by cross-point . . . any
ground which would have vitiated the verdict . . . including although not
limited to the ground that one or more of the jury=s findings have insufficient support in the evidence
or are against the overwhelming preponderance of the evidence as a matter of
fact . . . .@).





[9]  After the close of evidence, the trial court stated,
AThere is no evidence to my mind that he met his
obligations as a fiduciary.  However, seems to me it=s hotly in dispute as to whether or not he was, in
fact, a fiduciary.@





[10]  We grant no deference to the trial court=s statement that there is no evidence that Hasson
complied with his fiduciary duty to Lee.  See Martin-Simon v. Womack, 68
S.W.3d 793, 796 (Tex. App.CHouston [14th
Dist.] 2001, pet. denied) (AWe review
conclusions of law de novo to determine whether they are correct.@).  Rather, we relate the trial court=s observation solely to place the judgment and the
arguments of the parties in context.





[11]  Hasson suggests that Lee waived this argument by
failing to Alist a challenge to the finding of compliance with
fiduciary duty in her issues presented.@ 
However, Lee has challenged the trial court=s
ruling disregarding the jury=s finding that
a confidential relationship existed, and in a subsidiary argument, explicitly
argues, AThe JNOV error is harmful because there is no evidenceCand the trial court agreed on the record that there is
no evidenceCthat Hasson complied with that duty.@  This argument was sufficiently briefed, and we hold
that appellants= statement of the issues, their treatment of
subsidiary questions, and their corresponding statement of facts and argument
satisfy the requirements of the appellate briefing rules.  See Tex. R. App. P. 38.1(e)B(h).





[12]  This question tracks the Texas pattern jury charge
addressing breach of fiduciary duty.  See Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury
Charges: Fiduciary Duty PJC ' 104.2
(2003).





[13]  Because the questions of whether Hasson fully
disclosed important facts or benefitted at Lee=s expense are issues that the jury was required to find independently
from its determination of fairness, these issues are discussed separately
below, and we will not duplicate those discussions here; however, because these
issues are also factors in determining the fairness of the transaction, we
incorporate those sections by reference in our discussion of fairness.  





[14]  This figure is calculated by multiplying $75 million
by 57% (the proportion of the estate allocated to Lee) and multiplying the
resulting product by 11%.  The rental of the Dunsinane House was to be deducted
from this figure.





[15]  See section III(B)(5), infra.





[16]  See section III(B)(2), infra.





[17]  See section III(B)(1)(c), infra.





[18]  Pai testified that he sold the stock to convert the property to cash in
order to facilitate the division of property in the divorce.





[19]  This failure also demonstrates (a) Hasson=s absence of the utmost good faith, (b) his use of his
position to benefit at Lee=s expense, (c)
his failure to make reasonable use of Lee=s
confidence and to place her interests before his own, and (d) an instance in
which Hasson=s self-interest conflicted with his obligations as a
fiduciary.





[20]  This is also evidence that Hasson failed to exercise
the utmost good faith. 





[21]  In addition, this is evidence of the lack of
independent advice.





[22]  This is also evidence of Hasson=s failure to (a) exercise the utmost good faith and
scrupulous honesty, (b) place Lee=s
interests before his own, (c) avoid placing himself in a position in which his
self-interest might conflict with his fiduciary obligations, and (d) fully and
fairly disclose all important information to Lee concerning the transactions.





[23]  See section III(B)(4)(b), infra, for
descriptions of such transactions.





[24]  Although the record does contain a limited power of
attorney, it was effective only during a single specified week in March 2000. 
That power of attorney did not authorize Hasson to represent Lee in this transaction,
and it had expired by its own terms more than a month before this transaction. 
The jury was not free to disregard this evidence that Hasson failed to exercise
the utmost good faith and the most scrupulous honesty.  See City of Keller,
168 S.W.3d at 810B11 (noting that a reasonable jury cannot disregard
contrary evidence if there is no favorable evidence or if the contrary evidence
conclusively establishes the opposite of the fact the jury was asked to find).





[25]  See also section III(B)(1)(a), supra,
and sections III(B)(4)(b) and (c), infra.





[26]  See also section III(B)(1)(a)B(c), supra, and sections III(B)(4)(b),
III(B)(4)(c), and III(B)(5), infra.





[27]  See also sections III(B)(1)(a) and
III(B)(4)(a), supra, and section III(B)(4)(c), infra.





[28]  Bailes=s
bills were disputed and were the subject of a separate lawsuit that eventually
settled.





[29]  We note that Hasson had helped Lee obtain a loan
less than ninety days before the conversation Hasson describes.  Lee had used
the loan to purchase a condominium and resided there at the time of this
conversation.  There is no evidence in the record that Hasson advised Lee to
sell the condominium or that Lee proposed to do so. Construing this evidence in
the light most favorable to the verdict, we interpret Hasson to mean that Lee
indicated an intent to maintain multiple residences, dividing her time among residences
in Hawaii, her recently purchased condominium in Houston, and the home she
would build for the Hassons in Houston.





[30]  We review the evidence in light of the jury charge,
in which the jury was required to find that Hasson Adid not place himself in any position where his
self-interest might conflict with his obligations as a fiduciary.@  (emphasis added).  Thus, it is not significant to
our analysis that Hasson=s failure to disclose the potential unprofitability of
these real estate transactions may have been motivated by reasons other than
self-interest.  We further note, however, that his failure to advise Lee that
the transactions were likely to be unprofitable also demonstrated Hasson=s (a) failure to make reasonable use of the confidence
Lee placed in him, (b) failure to act in the utmost good faith and with
the most scrupulous honesty, (c) failure to place Lee=s interests before his own, (d) use of his position to
gain a benefit for himself at Lee=s
expense, and (e) failure to fully and fairly disclose all important information
to Lee about the transactions.





[31]  Because of our disposition of appellants= first issue, we do not reach the issue of whether the
agreement was unconscionable because it compensated Hasson for the unauthorized
practice of law and did so on a contingency fee basis.  See Hughes v. Fort
Worth Nat=l Bank, 164
S.W.2d 231, 234 (Tex. Civ. App.CFort Worth
1942, writ ref=d) (finding that the plaintiff who was paid $6,000 to
represent husband Ain working out a settlement@ of a marital estate worth more than $100,000 was
engaged in the unauthorized practice of law, and stating, AIt is not in accord with
reasonableness to think that Mr. Myers agreed to pay plaintiff this large sum
of money merely to act as a messenger, or to act in the modest capacity of a
personal servant for a comparatively short time.@). We note, however, that property settlements of
marital estates require a diverse set of legal skills.  Family law attorneys
are commonly called upon not only to represent their clients in court and to
advise them on divorce laws, but also to structure advantageous settlements in
accordance with state and federal laws in related fields such as tax, property,
estates, retirement, insurance, and even corporate or securities law.





[32]  See also Dominguez v. Brackey Enters., Inc.,
756 S.W.2d 788, 792 (Tex. App.CEl Paso 1988,
writ denied) (AAssurances that something will be done when followed
by a failure to do anything, or have it done, can constitute evidence that the
initial representations are misrepresentations.@).





[33]  This is also evidence of Hasson=s failure to exercise the utmost good faith and most
scrupulous honesty and to make reasonable use of the confidence placed in him.





[34]  Hasson also argues that he complied with his
fiduciary duty to Lee by urging her to protect her children by getting her own
life insurance policy.  However, this transaction occurred in August 1999,
before any agreement between Hasson and Lee, and therefore is not relevant to
our inquiry.





[35]  As a result of our disposition of appellants= first issue, we do not reach the remaining issues.





[36]  No claims  by or against Lou Pai have been
appealed.  Additionally, the parties do not appeal the judgment denying Lee=s conversion and fraud claims; thus, the previous
receipt of $4.22 million by Hasson and his companies is not at issue.